568 F.2d 911
 In the Matter of Banque de Financement, S. A., Debtor.
BANQUE de FINANCEMENT, S. A., Appellant,
and
Firestone Tire and Rubber Company, Intervenor in support of Appellant,
v.
The FIRST NATIONAL BANK OF BOSTON,
and
The Chase Manhattan Bank, N. A., Appellees.
 No. 447, Docket 76-5026.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 17, 1976.
Decided Aug. 30, 1977.
 
 Paul B. Bergman, New York City (Ford Marrin Esposito Witmeyer & Bergman, New York City, on the brief), for debtor-appellant Banque de Financement, S. A.
 James C. Blair, New York City (Cleary, Gottlieb, Steen & Hamilton, New York City, on the brief), for intervenor Firestone Tire & Rubber Company in support of appellant.
 Thomas A. Shaw, Jr., New York City (Thomas H. Walsh, Jr., and Breed, Abbott & Morgan, New York City, on the brief), for appellee The First National Bank of Boston.
 Peter A. Copeland, New York City (Milbank, Tweed, Hadley & McCloy, New York City, on the brief), for appellee The Chase Manhattan Bank, N. A.
 Before MULLIGAN, TIMBERS and VAN GRAAFEILAND, Circuit Judges.
 TIMBERS, Circuit Judge:
 On this appeal from a judgment entered July 29, 1976 in the Southern District of New York, Robert J. Ward, District Judge, affirming an order entered January 13, 1976 by Roy Babitt, Bankruptcy Judge, which dismissed as improvidently filed the debtor's petition under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq. (1970), the essential question is whether under the circumstances of this case it was appropriate for the bankruptcy court to exercise its inherent power to dismiss a Chapter XI petition as improvidently filed. We hold it was not. We reverse and remand with instructions.
 I. FACTS
 Debtor-appellant Banque de Financement, S. A. (Finabank) is a Swiss banking corporation. It neither does business nor maintains any office in the United States. In late December 1974 Finabank sustained a $46,000,000 loss when Edilcentro International Ltd. (Edilcentro), a Bahamian subsidiary of an Italian banking corporation, Societa Generale Immobiliare (SGI), defaulted on certain outstanding foreign exchange contracts with Finabank. This precipitated Finabank's insolvency. On January 10, 1975 Finabank filed with the Court of Justice of the Canton of Geneva a petition for a "sursis bancaire", or postponement of maturity. Under the applicable Swiss statute the filing of this petition resulted in an interlocutory moratorium period and the appointment by the Court of Justice on January 20, 1975 of a provisional commissioner, FIDES Societe Fiduciare (FIDES), a Swiss accounting corporation, to review Finabank's affairs and determine the feasibility of rehabilitation.[1]
 After the appointment of FIDES as provisional commissioner, Finabank's Swiss counsel entered into negotiations with SGI with a view to settling Edilcentro's obligation to Finabank. Until mid-May 1975 counsel entertained a serious hope that the negotiations would result in a recovery sufficient to permit Finabank to effect a successful reorganization and reenter the banking business. But then the outlook became discouraging. As a result on June 19 Finabank withdrew its January 10 petition for a "sursis bancaire" and substituted a petition for a "sursis concordataire", a banking moratorium. The Court of Justice granted this petition on July 14.
 This action did not necessarily foreclose Finabank's rehabilitation. The "sursis concordataire" moratorium procedure contemplated either rehabilitation or liquidation depending on subsequent events. Accordingly the Court of Justice, in its opinion of July 14 which explicitly recognized the possibility of successful reorganization, appointed two additional commissioners to serve with FIDES and directed the commissioners to take the steps necessary to effect an arrangement with Finabank's creditors.[2]
 Thereafter matters stood in abeyance while another round of negotiations was conducted with SGI. On July 9, 1976 the commissioners, having determined that no rehabilitation could be expected, filed a petition for a "concordat par abandon d'actifs", a court-supervised liquidation. The Court of Justice ordered Finabank's liquidation in December 1976.
 
 
 1
 Backing up for a moment to the time of Finabank's insolvency in December 1974, we turn to the events in the United States which resulted in the instant Chapter XI petition.
 
 
 2
 Finabank had $12,500,000 on deposit at Continental Bank International (CBI) in New York City at the time Edilcentro defaulted. The Edilcentro default caused Finabank in turn to default on its foreign exchange contracts with appellees The First National Bank of BostonBB and The Chase Manhattan Bank, N. A. (Chase). In January 1975 FNBB and Chase commenced separate breach of contract actions against Finabank in the Southern District of New York. FNBB claimed $9,176,375, Chase $491,000. In these actions both banks obtained orders of attachment in the amounts claimed. Chase levied on January 6, FNBB on January 20,[3] the dates the respective actions were commenced.
 
 
 3
 On May 5, only a few hours before the expiration of the four month limitation period provided for the avoidance of a preferential transfer by Bankruptcy Act § 60a(1), 11 U.S.C. § 96(a)(1) (1970), with respect to the Chase attachment, Finabank filed a petition for an arrangement under Chapter XI. There followed a series of protracted proceedings which resulted in Judge Babitt's order of January 13, 1976 granting the motions by FNBB and Chase to dismiss the petition. Finabank had requested the bankruptcy court to bide its time in the hope that a plan of rehabilitation could be effected in Switzerland; and that such plan, if submitted and approved in the Chapter XI proceeding, would result in the joint administration of all assets of Finabank. But nothing came of the negotiations with SGI during the summer and fall of 1975. Finabank was unable to submit to the bankruptcy court a plan of arrangement, the confirmation of which of course is the objective of a Chapter XI proceeding. At hearings held on June 10, July 8, and August 19, Judge Babitt expressed growing doubt as to whether Finabank ever would be able to obtain rehabilitation in the bankruptcy court. Finabank's counsel responded to the judge's queries with a realistic assessment of Finabank's proceedings in Switzerland; he stated that, while a plan still might be formulated successfully, only a "slim" likelihood remained. On August 19 the judge ordered Finabank to file its plan of arrangement by September 3. No plan was filed by that date. Thereafter four further extensions were granted but no plan was ever filed.
 
 
 4
 Finabank's inability to submit a plan of arrangement was not its only difficulty in the bankruptcy court. Among other things, its petition failed to include a complete list of creditors as required by Bankruptcy Act § 324(1), 11 U.S.C. § 724(1) (1970), and Bankruptcy Rule 11-11(b).[4] Finabank did disclose the names of those foreign and domestic banks which were its creditors. But, constrained by the Swiss banking secrecy laws and their criminal penalties, it included neither the names nor the addresses of its individual depositors. According to FNBB's expert on Swiss law, the Swiss banking secrecy laws "effectively prohibit . . . Finabank . . . from furnishing to a foreign court, or from directly or indirectly making public, the names and addresses of its depositors or creditors or divulging information concerning their dealings with Finabank, even after the filing of a plan for composition with creditors or a bankruptcy." Finabank does not dispute this.
 
 
 5
 In his opinion of January 12, 1976 granting the motion of FNBB and Chase to dismiss the Chapter XI petition, Judge Babitt rested his decision on two grounds. First, he held that Finabank was a "banking corporation" within the meaning of Bankruptcy Act § 4a, 11 U.S.C. § 22(a) (1970), which could not seek relief under the Bankruptcy Act. Second, with respect to Finabank's default in filing a plan and its failure to file a complete list of creditors, the judge concluded that because "this Chapter XI cannot comply with the most elementary and preliminary provisions of the Act, much less with successful end result," there was "neither purpose to achieve the desired result nor likelihood of doing so." Accordingly the judge granted the motion to dismiss in the exercise of the bankruptcy court's inherent power to dismiss a Chapter XI petition where no prospect of rehabilitation appears, citing Ira Haupt & Co. v. Klebanow, 348 F.2d 907 (2 Cir. 1965) (per curiam). See also SEC v. United States Realty and Improvement Co., 310 U.S. 434 (1940).
 
 
 6
 On Finabank's petition to review the order of the bankruptcy court, Judge Ward in his opinion of July 28, 1976 affirmed the dismissal of the petition. By the time Finabank's petition to review was heard, the first ground upon which the bankruptcy court had rested its decision had become foreclosed by our decision of May 25, 1976 in In re Israel-British Bank (London), Ltd., 536 F.2d 509 (2 Cir.), cert. denied, sub. nom. Bank of the Commonwealth v. Israel-British Bank (London) Ltd., et al., 429 U.S. 978 (1976), which held that a foreign bank is not a "banking corporation" within the meaning of Bankruptcy Act § 4a. Judge Ward affirmed the bankruptcy court on its second ground, holding that it properly had exercised its discretion in dismissing the petition. From the
 
 
 7
 judgment entered on Judge Ward's opinion, Finabank has taken
 
 
 8
 this appeal. II. BANKRUPTCY COURT'S INHERENT POWER
 
 TO DISMISS A CHAPTER XI PETITION
 
 9
 The "inherent power" upon which the bankruptcy court relied in dismissing Finabank's petition draws in question the debtor's good faith in petitioning for relief under Chapter XI. The Supreme Court's decision in SEC v. United States Realty and Improvement Co., supra, is the principal source of authority. There, relying on the equitable principles which temper the exercise of jurisdiction by the bankruptcy court, the Court implied a power to dismiss a Chapter XI petition so as to remit the debtor to more appropriate relief under Chapter X. See also Mecca Temple of Ancient Arabic Order of Nobles of Mystic Shrine v. Darrock, 142 F.2d 869 (2 Cir.), cert. denied, 323 U.S. 784 (1944). In Ira Haupt & Co. v. Klebanow, supra, we applied the United States Realty principle to a Chapter XI petition which had been filed without hope of rehabilitation where the dismissal had the effect of remitting the debtor to straight bankruptcy.
 
 
 10
 Broad as such inherent power is, the circumstances under which it may be invoked are limited by the express terms of the Bankruptcy Act. Cf. SEC v. United States Realty and Improvement Co., supra, 310 U.S. at 455. Specifically, most dismissals prompted by circumstances which arise after the filing of the petition[5] such as failure to file the required statements and schedules or to submit a plan are subject to the provisions of Bankruptcy Act § 376, 11 U.S.C. § 776 (1970),[6] and Bankruptcy Rule 11-42(b).[7] These provisions differ from an inherent power dismissal in that they permit dismissal or adjudication only after hearing on notice to the debtor and creditors,[8] subject to the requirement that the action be in "the best interest of the estate." See 8 Collier on Bankruptcy P 4.12, at 414 n. 2 (Moore ed. 1976).
 
 
 11
 The bankruptcy court here rested the exercise of its inherent power on two grounds that the "sole purpose" of the proceeding was to frustrate the creditors' attachments rather than to formulate an arrangement, and that the debtor had failed to file a complete list of creditors. We turn now to an examination of each of these two grounds in the light of the general principles set forth above.
 
 
 12
 (A) No Intention to Effect Rehabilitation
 
 
 13
 In finding that Finabank never intended to pursue the Chapter XI proceeding to obtain confirmation of a plan of arrangement, the bankruptcy court looked to events e. g., Finabank's multiple defaults in filing a plan and its counsel's concessions regarding the likelihood of rehabilitation which occurred after the petition was filed on May 5, 1975. Although such post-filing events may be probative of an absence of intent to seek an arrangement at the time of filing, see In re Tinkoff, 85 F.2d 305, 307, 309 (7 Cir. 1936), they fall short of supporting the bankruptcy court's exercise of inherent power in the instant case.
 
 
 14
 In filing its Chapter XI petition Finabank instituted a proceeding which in effect was ancillary to the pending moratorium in Switzerland. As a result its motivations and expectations on May 5 and its alleged dilatory conduct thereafter cannot be determined without reference to events in Switzerland. On May 5 the Swiss provisional commissioner was still in the process of determining the feasibility of a "sursis bancaire". Success in its negotiations with SGI was the critical objective. Finabank's Swiss counsel claims to have had hopes of success as of May 5. Possible rehabilitation remained a generally recognized possibility even after the "sursis concordataire" substitution of June 19. Not until July 1976 more than a year later was all hope formally abandoned. Since, as a practical matter, rehabilitation in the United States depended upon the approval of a plan in Switzerland, Finabank realistically had no choice but to delay the filing of a plan of arrangement in the bankruptcy court.
 
 
 15
 We do not take issue with the bankruptcy court's finding that the need to frustrate the attachments caused Finabank to file its Chapter XI petition. But that alone does not establish an absence of intent to seek rehabilitation. And, in view of the objective of the Bankruptcy Act of insuring equal distribution of assets among general creditors, such filings should not be discouraged, even under Chapter XI. See In re Israel-British Bank (London) Ltd., supra, 536 F.2d at 513.
 
 
 16
 It also must be borne in mind that Finabank, in seeking relief under the Bankruptcy Act in aid of its Swiss proceeding, had no practical alternative to a Chapter XI petition. Straight bankruptcy would have conflicted with the Swiss rehabilitation proceeding.
 
 
 17
 We conclude that the bankruptcy court was clearly erroneous, see Bankruptcy Rule 810, in finding that Finabank never intended to pursue its Chapter XI proceeding for purposes of rehabilitation. We hold therefore that the first ground of the bankruptcy court's inherent power dismissal lacked the necessary underpinning.
 
 
 18
 (B) Incomplete List of Creditors
 
 
 19
 This brings us to the second ground of the bankruptcy court's inherent power dismissal Finabank's failure to file a complete list of creditors pursuant to Bankruptcy Act § 324(1), 11 U.S.C. § 724(1) (1970),[9] and Rule 11-11.[10]
 
 
 20
 The requirement with which Finabank found itself unable to comply is phrased in mandatory terms: Under Rule 11-11(a), "The debtor shall file with the court schedules of all his debts. . . ." (emphasis added). See also Bankruptcy Act § 7a(8), 11 U.S.C. § 25(a)(8) (1970) (scheduling requirement for straight bankruptcy);[11] 1A Collier on Bankruptcy, supra, P 7.08(2), at 984. These provisions have been construed to mean what they say. E. g., In re Everick Art Corp., 39 F.2d 765, 767 (2 Cir. 1930); In re Semel, 411 F.2d 195 (3 Cir.), cert. denied, 396 U.S. 905 (1969); Carolina Motor Express Lines, Inc. v. Blue & White Service, Inc., 192 F.2d 89, 92 (7 Cir. 1951). We know of no instance where a bankrupt has been excused from this filing requirement. The question presented by Finabank's having filed only a partial list of creditors therefore is less one of the bankruptcy court's inherent power to dismiss the petition than one of its ability to proceed at all once it became clear that Finabank was not able to disclose the identities and claims of its individual depositors.
 
 
 21
 The reason for the Bankruptcy Act's mandatory language and the uniform application of it by the courts is obvious. The list of creditors is necessary to the conduct of the bankruptcy proceeding because it (1) gives the court information as to persons entitled to notice; (2) informs the court of the claims against the estate and the considerations upon which they rest; and (3) limits to the particular proceeding the effect of the discharge of the bankrupt.[12] 1A Collier on Bankruptcy, supra, P 7.11(2), at 990.
 
 
 22
 If this were all that is involved, we could terminate our inquiry at this point and simply hold that Finabank is to be left impaled on its inability to comply with the requirement that it file a complete list of creditors and thus be denied any Chapter XI relief. There are substantial countervailing considerations however which impel us to hold otherwise.
 
 
 23
 Finabank, for the specific purpose of avoiding preferential attachments, has invoked our Bankruptcy Act to obtain an administration of assets located in this country ancillary to an administration of assets located in its foreign domicile. This type of proceeding is contemplated explicitly by Bankruptcy Act § 2a(1), 11 U.S.C. § 11(a)(1) (1970).[13] That section, by providing a jurisdictional underpinning in property located in this country, fosters in international situations one of the basic purposes of the Act, i. e. equal distribution among creditors. The Act also permits the United States segment of such an international proceeding, whether a reorganization or a straight bankruptcy, to function essentially as an instrument to set aside preferences. Under § 2a(22), 11 U.S.C. § 11(a)(22) (1970),[14] and Bankruptcy Rule 119,[15] the bankruptcy court may exercise its discretion to dismiss the proceeding, or, after setting aside any preferences,[16] to suspend the proceeding and permit assets located in this country to be administered pursuant to the domiciliary proceeding.
 
 
 24
 Recently, in construing § 4a of the Act, we stressed the importance of promoting the goal of equality of distribution of assets in the international context. In re Israel-British Bank (London) Ltd., supra, 536 F.2d at 513. In our view, achievement of this goal, contemplated specifically in §§ 2a(1) and 2a(22), requires in the instant case, first, recognition of the fact that international bankruptcies can raise problems not contemplated by the Act, and then, some flexibility in responding to those problems consistent with the strong public policy which is at the core of the Act. Cf. Nadelmann, Compositions Reorganizations and Arrangements In The Conflict of Laws, 61 Harv.L.Rev. 804, 835 (1948).
 
 
 25
 Flexibility in the international context of course should not come at the expense of the orderly administration of the Act. Ordinarily the scheduling requirements must take precedence even if preferences thereby are allowed to survive. Otherwise the administrative and equitable purposes of the scheduling requirements themselves would be frustrated.
 
 
 26
 The instant case however is not an ordinary one. Aside from the policy considerations mentioned above, it differs in two material respects from those cases in which the requirement of a complete list of creditors has been strictly enforced. The debtors in those cases all sought relief from that requirement either without giving any compelling reason why they should be relieved from the statutory burden of producing the information or without offering any substitute means of satisfying the purpose of the requirement.[17] At the evidentiary hearing on the remand which we order here, Finabank may be able to comply in both respects.
 
 
 27
 As for Finabank's reason for seeking relief from the creditors list requirement, its purpose is not to obtain some advantage over its creditors. It seeks to protect them. Nor is it attempting to pass on to a trustee the task of straightening out badly kept records. Finabank is constrained by the criminal law of its domicile.
 
 
 28
 As for a substitute to satisfy the creditors list requirement, since this is a bankruptcy proceeding in aid of a corresponding proceeding abroad, a list of creditors does exist. According to Finabank, the identities and claims of the secret depositors are in the possession of the Swiss court. It suggests two possible ways of coordinating the proceeding in this country with that in Switzerland to achieve the substantial equivalent of a complete list of creditors. First, § 2a(22) and Rule 119 might be utilized. The bankruptcy court would take jurisdiction, set aside the attachments, and then suspend the proceeding and permit the assets located in this country to be administered in the Swiss proceeding. Under the second alternative, there would be a full administration in this country, coordinated with the Swiss proceeding. The Swiss court would notify the depositors who then would elect whether to appear in the proceeding here. Pro rata distribution would be achieved eventually by marshalling of assets in Switzerland which would take into account the recoveries of the creditors who appear here.[18]
 
 
 29
 We do not pass on the viability of these alternatives at this stage. Both require further factual and legal development upon remand. See note 18 supra. Suffice it to say that Finabank has proposed alternatives to the list of creditors which on their face appear to have a fair chance of satisfying the objectives of that requirement. But the bankruptcy court did not consider them.
 
 
 30
 We hold that neither § 324(1) nor Rule 11-11 preclude consideration of such alternatives in this case. The problem here is novel and was not contemplated by the drafters of the scheduling requirements. This is so because the provisions which appear to be in conflict here came into the Bankruptcy Act by different routes. Proceedings in this country ancillary to foreign bankruptcies first were made possible under the 1898 Act. See Nadelmann, The National Bankruptcy Act and The Conflict of Laws, 59 Harv.L.Rev. 1025, 1035-39 (1946). The requirement of a list of creditors long predates the 1898 Act; it was carried over from predecessor statutes. See Bankruptcy Act of 1867, ch. 176, § 11, 14 Stat. 517; In re Hall, 11 F.Cas. 201 (N.D.N.Y.1868) (No. 5,922); In re Plimpton, 19 F.Cas. 874 (S.D.N.Y.1842) (No. 11,227). Far from being intended by the drafters, the result of strict enforcement of the scheduling requirements in this case would be anomalous. A rule intended to protect creditors would be applied to foreclose equal distribution of the assets among creditors in a situation where the objectives of the rule might well be satisfied by other means. In our view the scheduling requirements should be construed, under the unusual circumstances of this case and depending upon the further evidence adduced upon remand, to prevent the anomalous result which otherwise would occur.
 
 
 31
 We hold that Finabank's petition was not inherently defective at the time it was filed and that the dismissal under the inherent power of the bankruptcy court was error.
 
 III. OTHER ASSERTED GROUNDS FOR DISMISSAL
 
 32
 (A) Bankruptcy Act § 2a(22) and Rule 119
 
 
 33
 FNBB urges as an alternate ground to sustain the dismissal of the petition the bankruptcy court's discretion under § 2a(22) and Rule 119. It relies on the provision of the Rule that suspension or dismissal be considered with "regard to the rights and convenience of local creditors." It contends that the "rights" protected by the dismissal were preferential claims of FNBB and Chase pursuant to their attachments, together with the claims which two other American parties had interposed in CBI's interpleader action. See note 3 supra. The bankruptcy court agreed with this view of the meaning of local creditors' "rights", citing Disconto Gesellschaft v. Umbreit, 208 U.S. 570, 582 (1908), for the proposition that a country "first protect(s) the rights of its citizens in local property before permitting it to be taken out of the jurisdiction for administration in favor of those residing beyond its borders." The district court, which also agreed, added that the dismissal would permit the Americans to recover "without having to rely on Swiss bankruptcy procedures which are enmeshed with the Swiss bank secrecy laws." We disagree with this construction of § 2a(22) and Rule 119.
 
 
 34
 Section 2a(22) was not intended to be the instrument by which jurisdiction over a foreign domiciliary grounded in § 2a(1) could be undercut for the purpose of validating preferential transfers to United States nationals. Section 2a(22) was enacted as an administrative reform. It was designed to avoid needless duplication of effort by courts and creditors in those cases where an ancillary proceeding in this country could be coordinated with or entirely dismissed in favor of a domiciliary proceeding abroad. See S.Rep.No. 1954, 87th Cong., 2d Sess. (1962), reprinted in (1962) U.S.Code Cong. & Ad.News 2603; H.R.Rep.No. 1208, 87th Cong. 1st Sess. (1961). The construction of local "rights" most consonant with this objective was suggested by Professor Nadelmann nearly thirty years ago. In exercising its discretion the district court is to guard against forcing American creditors to participate in foreign proceedings in which their claims will be treated in some manner inimical to this country's policy of equality. See Nadelmann, Compositions Reorganizations and Arrangements In the Conflict of Laws, 61 Harv.L.Rev. 804, 829-30 (1948); Revised Report of The National Bankruptcy Conference Special Committee on Insurance Companies and Foreign Banks, at 12, 13-14 (1976).
 
 
 35
 We hold that the construction of § 2a(22) urged by FNBB would impose a substantive impact on § 2a(1) which Congress did not intend,[19] and that neither § 2a(22) nor Rule 119 support the bankruptcy court's dismissal.[20]
 
 
 36
 (B) Bankruptcy Act § 376 and Rule 11-42(b).
 
 
 37
 The circumstances upon which the bankruptcy court relied in exercising its inherent power Finabank's repeated defaults in filing a plan and its failure to file a complete list of creditors could constitute grounds for dismissal "for want of prosecution" under Rule 11-42(b)(1). Advisory Committee's Note to Bankruptcy Rule 11-42(b). But Rule 11-42(b) imposes the substantive requirement that the dismissal be in the "best interest of the estate" a matter upon which the bankruptcy court did not rule.
 
 
 38
 It of course would be inappropriate for us to rule upon such an issue until the courts below have an opportunity to do so. Having held that the bankruptcy court erred in dismissing the petition pursuant to its inherent power, we note only that the dismissal in any event may not be sustained by the retrospective application of Rule 11-42(b). The "best interest(s)" to be considered are those of the debtor and the creditors. Advisory Committee's Note to Bankruptcy Rule 11-42(b); 9 Collier on Bankruptcy, supra, P 10.03(2), at 520 & n. 5. In view of the existence of alternative courses of action, dismissal of the petition at the stage of the proceedings at which the bankruptcy court acted in itself would be questionable. Of the entire group of unsecured creditors, only the interests of FNBB and Chase would be served. Here the best interests of the estate for purposes of Rule 11-42(b) and the general principle of equality among creditors appear to coalesce.
 
 IV. PROCEEDINGS ON REMAND
 
 39
 We reverse the judgment dismissing the petition and remand the case to the district court with instructions to refer the case to the bankruptcy court for an evidentiary hearing on the present viability of an administration under the Bankruptcy Act in this country. We were advised at the argument of the instant appeal that Finabank went into liquidation in Switzerland during the pendency of this appeal. Earlier questions regarding Finabank's failure to file a plan therefore appear to be moot. The problem presented by the Swiss banking secrecy laws however remains alive. The bankruptcy court should ascertain what those laws require at this stage of the proceedings. If they are applicable, the court should consider, in accordance with this opinion, the alternative procedures suggested by the parties to ascertain whether they satisfactorily fulfill the function of the list of creditors.
 
 
 40
 Reversed and remanded with instructions.
 
 
 
 [1]
 The rehabilitation contemplated by this procedure under Swiss law occurs out of court and entails the payment of all debts in full
 
 
 [2]
 As of May 31, 1975 Finabank had liabilities of Swiss Fr. 188,021,614.62 and assets of Swiss Fr. 98,361,001. According to the July 14 opinion of the Court of Justice, "the unprotected amount of about Swiss Fr. 90 million shown by the balance-sheet . . . is indisputably due to the nonfulfillment by Edilcentro . . . of its engagements . . . ." The court concluded that "all things considered . . . a liquidation by a proceeding of arrangement with creditors is likely to produce results which are more advantageous to creditors than a liquidation through bankruptcy proceedings."
 
 
 [3]
 On January 21, CBI commenced an interpleader action to obtain adjudication of the rights of various claimants to certificates of deposit and other funds which CBI was holding for the account of Finabank. Continental Bank International v. Banque de Financement, S.A., 75 Civ. 299 (S.D.N.Y.). The contract actions by FNBB and Chase against Finabank were consolidated with the interpleader action on September 19, 1975
 In the consolidated action FNBB and Chase claim priority based on their attachments. Two other American parties have filed claims totalling $298,803. Several foreign corporations and individuals have filed claims totalling several million dollars. Finabank as a party to the interpleader action claims that $11,000,000 of its account with CBI "represents trust assets held by Finabank as custodian" which are not "a potential pool asset for Finabank's general creditors."
 
 
 [4]
 FNBB's motion of June 26, 1975 to dismiss the Chapter XI petition claimed that the petition was deficient in the following additional respects: (1) the schedules of debts, property and executory contracts and the statement of affairs failed to satisfy the requirements of Rule 11-11(a) and Bankruptcy Forms 6 and 8; (2) the allegations required by Bankruptcy Act § 323, 11 U.S.C. § 723 (1970), were lacking; (3) Exhibit A under Bankruptcy Form 11-F1 was lacking; and (4) FIDES had no authority to file the petition
 Judge Babitt noted but did not pass on these claims.
 
 
 [5]
 We do not hold that the inherent power of the bankruptcy court never may be relied upon for a dismissal based on facts which arise after the filing of the petition. Normally, of course, such a situation would be covered by Rule 11-42. After a good faith filing, a rehabilitation that subsequently becomes hopeless would manifest itself in grounds for dismissal such as failure to propose a plan or withdrawal or abandonment of a plan which would fall squarely within Rule 11-42
 
 
 [6]
 Bankruptcy Act § 376, 11 U.S.C. § 776 (1970), in relevant part provides:
 "If the statement of the executory contracts and the schedules and statement of affairs, as provided by paragraph (1) of section 724 of this title, are not duly filed, or if an arrangement is not proposed in the manner and within the time fixed by the court, or if an arrangement is withdrawn or abandoned prior to its acceptance, or is not accepted at the meeting of creditors or within such further time as the court may fix, or if the money or other consideration required to be deposited is not deposited, or the application for confirmation is not filed within the time fixed by the court, or if confirmation of the arrangement is refused, the court shall
 (2) where the petition was filed under section 722 of this title, enter an order, upon hearing after notice to the debtor, the creditors, and such other persons as the court may direct, either adjudging the debtor a bankrupt and directing that bankruptcy be proceeded with pursuant to the provisions of this title or dismissing the proceeding under this chapter, whichever in the opinion of the court may be in the interest of the creditors: Provided, however, That an order adjudging the debtor a bankrupt may be entered without such hearing upon the debtor's consent."
 
 
 [7]
 Bankruptcy Rule 11-42(b) in relevant part provides:
 "(b) Dismissal or Conversion to Bankruptcy for Want of Prosecution, Denial or Revocation of Confirmation, Default, or Termination of Plan. The court shall enter an order, after hearing on such notice as it may direct, dismissing the case, or adjudicating the debtor a bankrupt if he has not been previously so adjudged, or directing that the bankruptcy case proceed, whichever may be in the best interest of the estate
 (1) for want of prosecution; or
 (2) for failure to comply with an order under Rule 11-20(d) for indemnification; or
 (3) if confirmation of a plan is denied; or
 (4) if confirmation is revoked for fraud and a modified plan is not confirmed pursuant to Rule 11-41; or
 (5) where the court has retained jurisdiction after confirmation of a plan:
 (A) if the debtor defaults in any of the terms of the plan; or
 (B) if a plan terminates by reason of the happening of a condition specified therein.
 The court may reopen the case, if necessary, for the purpose of entering an order under this subdivision."
 
 
 [8]
 Under its inherent power, by contrast, the bankruptcy court may act sua sponte, without giving notice. See In re Ettinger, 76 F.2d 741 (2 Cir. 1935)
 
 
 [9]
 Bankruptcy Act § 324(1), 11 U.S.C. § 724(1) (1970), in relevant part provides:
 "Statements and fees accompanying petition. The petition shall be accompanied by
 (1) a statement of the executory contracts of the debtor, and the schedules and statement of affairs, if not previously filed: Provided, however, That if the debtor files with the petition a list of his creditors and their addresses and a summary of his assets and liabilities, the court may, on application by the debtor, grant for cause shown further time, not exceeding ten days, for filing the statement of the executory contracts and the schedules and statements of affairs, and such time shall not further be extended except for cause shown and on such notice and to such persons as the court may direct. . . ."
 
 
 [10]
 Bankruptcy Rule 11-11 in relevant part provides:
 "Schedules, Statements of Affairs, and Statement of Executory Contracts
 (a) Schedules and Statements Required. The debtor shall file with the court schedules of all his debts and all his property, a statement of his affairs, and a statement of his executory contracts, prepared by him in the manner prescribed by Official Forms No. 11-F5 and either No. 11-F6 or No. 11-F7, whichever is appropriate. The number of copies of the schedules and statements shall correspond to the number of copies of the petition required by these rules.
 (b) Time Limits. Except as otherwise provided herein, the schedules and statements, if not previously filed in a pending bankruptcy or Chapter XII case, shall be filed with the petition. A petition shall nevertheless be accepted by the clerk if accompanied by a list of all the debtor's creditors and their addresses, and the schedules and statements may be filed within 15 days thereafter in such case. On application, the court may grant up to 30 additional days for the filing of schedules and the statements; any further extension may be granted only for cause shown and on such notice as the court may direct."
 
 
 [11]
 Bankruptcy Act § 7a(8), 11 U.S.C. § 25(a)(8) (1970), provides:
 "Duties of bankrupts.
 (a) The bankrupt shall . . . (8) prepare, make oath to, and file in court within five days after adjudication, if an involuntary bankrupt, and with his petition, if a voluntary bankrupt, a schedule of his property showing the amount and kind of property, the location thereof and its money value, in detail; and a list of all his creditors, including all persons asserting contingent, unliquidated, or disputed claims, showing their residences or places of business, if known, or if unknown that fact to be stated, the amount due to or claimed by each of them, the consideration thereof, the security held by them, if any, and what claims, if any, are contingent, unliquidated or disputed; and a claim for such exemptions as he may be entitled to; all in triplicate, one copy for the clerk, one for the referee, and one for the trustee . . . ."
 
 
 [12]
 Under Bankruptcy Act § 17a(3), 11 U.S.C. § 35(a)(3) (1970), debts not duly scheduled are not discharged unless the creditor had notice or actual knowledge of the proceedings
 
 
 [13]
 Bankruptcy Act §§ 2a(1) and (22), 11 U.S.C. §§ 11(a)(1) and (22) (1970), provides:
 "Creation of courts of bankruptcy and their jurisdiction
 (a) The courts of the United States hereinbefore defined as courts of bankruptcy are created courts of bankruptcy and are invested, within their respective territorial limits as now established, or as they may be hereafter changed, with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in proceedings under this title, in vacation, in chambers, and during their respective terms, as they are now or may be hereafter held, to
 (1) Adjudge persons bankrupt who have had their principal place of business, resided or had their domicile within their respective territorial jurisdictions for the preceding six months, or for a longer portion of the preceding six months than in any other jurisdiction, or who do not have their principal place of business, reside, or have their domicile within the United States, but have property within their jurisdiction, or in any cases transferred to them pursuant to this title; " (emphasis added).
 "(22) Exercise, withhold, or suspend the exercise of jurisdiction, having regard to the rights or convenience of local creditors and to all other relevant circumstances, where a bankrupt has been adjudged bankrupt by a court of competent jurisdiction without the United States."
 
 
 [14]
 See note 13 supra
 
 
 [15]
 Bankruptcy Rule 119 provides:
 "Bankrupt Involved in Foreign Proceeding
 When a proceeding for the purpose of the liquidation or rehabilitation of his estate has been commenced by or against a bankrupt in a court of competent jurisdiction without the United States, the court of bankruptcy may, after hearing on notice to the petitioner or petitioners and such other persons as it may direct, having regard to the rights and convenience of local creditors and other relevant circumstances, dismiss a case or suspend the proceedings therein under such terms as may be appropriate."
 Rule 119 applies to Chapter XI proceedings by the terms of Bankruptcy Rule 11-17.
 
 
 [16]
 See Nadelmann, The National Bankruptcy Act and the Conflict of Laws, 59 Harv.L.Rev. 1025, 1046 (1946)
 
 
 [17]
 The debtor in In re Everick Art Corp., supra, 39 F.2d at 767, merely sought to exclude from participation those creditors whose claims it disputed. In In re Semel, supra, 411 F.2d at 197, the debtor was a practicing attorney who sought to avoid listing unpaid fees by claiming an attorney-client privilege; while the Third Circuit rejected the excuse, it appeared to hold open the possibility that the referee could determine any particular claim of privilege after the debtor had completed his list. Id. A debtor whose records were in chaotic condition was held to full compliance with the official forms in In re Free, 38 F.Supp. 316 (D.Conn.1941). See also Carolina Motor Express Lines, Inc. v. Blue & White Service, Inc., 192 F.2d at 92; but cf. In re DeSoto Crude Oil Purchasing Corp., 35 F.Supp. 1, 6-7 (W.D.La.1940) (late filing excused where list of creditors was "unavailable" at time voluntary petition was filed)
 
 
 [18]
 We recognize that there are difficulties in connection with both of Finabank's alternative procedures. While we note some of those difficulties, we draw no conclusions regarding them but leave them for further inquiry by the bankruptcy court
 Undoubted power to effect the first alternative stems from § 2a(22) and Rule 119. FNBB however contends that, if the assets in this country were to be remitted to the Swiss court for administration, the individual depositors would be able to extract payment in full to the extent of $11,000,000. This contention is based on Finabank's claim in the interpleader action that this $11,000,000 does not belong to it but to its depositors. If this were found in fact to be the result, a suspension under Rule 119 might be improper. Rule 119 must be applied with "regard to the rights . . . of local creditors," and priority treatment of the depositors in the Swiss court would derogate those rights. See Nadelmann, The National Bankruptcy Act and The Conflict of Laws, 59 Harv.L.Rev. 1025, 1045 (1946).
 At first blush, the second alternative might be said to lack explicit support in the Act. Section 2a(22) and Rule 119 authorize only "dismissal" or "suspension" of proceedings. See p. 921, infra.
 If the procedure suggested is found to lack explicit support in the Act or the Rule, the bankruptcy court should determine whether it might be permissible in the exercise of the bankruptcy court's equitable powers. Cf. SEC v. United States Realty & Improvement Co., supra.
 
 
 [19]
 We would not be inclined to accept FNBB's construction even if a contrary Congressional intent were less clear than it is. A construction so contrary to the principle of equality in the Act would require a very clear expression of Congressional intent. See In re Israel-British Bank (London) Ltd., supra, 536 F.2d at 515
 
 
 [20]
 We do not suggest that § 2a(22) and Rule 119, as construed herein, are unavailable on remand. See note 18 supra